# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
# HUNTINGTON DIVISION

————————————————————— X
: 
NAOMI SPENCER DALY and DARRELL CASTLE, : Civil Action No:
: 3:16-cv-08981
Plaintiffs, :
v. :
NATALIE TENNANT, in her official capacity as the :
Secretary of State of the State of West Virginia, :
:
Defendants. :

—————————————————————

## BRIEF AMICUS CURIAE ON BEHALF OF THE AMERICAN CIVIL LIBERTIES UNION OF WEST VIRGINIA FOUNDATION

### I. Interest of Amicus Curiae

The American Civil Liberties Union ("ACLU") of West Virginia Foundation is a nonprofit, nonpartisan organization dedicated to the principles of liberty and equality embodied in the United States Constitution and our nation's civil rights laws. The ACLU has long been dedicated to protecting the voting and ballot access rights of American citizens. The ACLU recognizes that the ability to vote for a candidate of one's choice is one of the most fundamental rights in our democracy.

The defendant's actions threaten to unconstitutionally remove a number of independent candidates from ballots across the state. West Virginia's ballot access requirements, as interpreted by the West Virginia Supreme Court of Appeals, are constitutionally suspect on their face. The fact that this deadline was retroactively created and applied to plaintiffs makes it not

just suspect, but clearly unconstitutional. The ACLU therefore submits this Proposed Brief *Amicus Curiae* in support of Plaintiffs' Emergency Motion for a Temporary Restraining Order.

**II. Background**

On September 15, 2016, the West Virginia Supreme Court of Appeals decided *Wells v. State ex rel. Miller*, No. 16-0779 (W. Va. Sup. Ct. App. Sept 15, 2016). On September 16, the defendant, Secretary Tennant, announced that she believed that decision required her to remove seventeen independent candidates from the general election ballot.

West Virginia has separate requirements for candidates seeking to run for office as a member of a recognized party and candidates seeking to run as independents or with a party that is not recognized by the State of West Virginia. Recognized parties may nominate their candidates for the general election by primary election or party convention. People seeking to run as independent candidates (or as candidates affiliated with an unrecognized party) are governed by West Virginia Code §§ 3-5-23 and 3-5-24. This requires independent candidates to submit their required petition signatures, certificate of announcement, and filing fee with the appropriate filing officer by August 1.

The plaintiffs in the instant action are affiliated with unrecognized political parties. According to the Verified Complaint, each plaintiff submitted a nominating petition containing the requisite number of signatures, a certificate of announcement, and filing fee to the Secretary of State prior to the August 1 deadline. *See* Verified Compl., at ¶ 14. The plaintiffs received notice from the Secretary of State on or about August 25, 2016, that they had qualified for the general election ballot. It was not until Friday, September 16, 2016 that plaintiffs were informed that they were being removed from the ballot based on the Supreme Court of Appeals' decision in *Wells*. The notification from Defendant's office stated that the *Wells* decision required

independent candidates to have filed a certificate of announcement no later than January 30, 2016, in order to appear on the general election ballot in November, despite the fact that Defendant's office had previously found each of the plaintiffs eligible to run for office as independents under West Virginia Code §§ 3-5-23 and 3-5-24.

## III. Argument

### A. Removing Plaintiffs from the General Election Ballot is Unconstitutional.

The ACLU supports the plaintiffs' contention that the defendant's removal of the plaintiffs from the general election ballot is unconstitutional.

#### 1. A January 30 Deadline for Independent Candidates Unconstitutionally Restricts Ballot Access.

A January 30 deadline for independent candidates to run in an election the following November would effectively prohibit most potential independent candidates from running for office. This also means that the opportunity for voters to coalesce around such a candidacy would be cut off at the same time. Moreover, as a practical matter, independent candidates would be required to actually make their decision well before the January 30 deadline in order to gather the required signatures and raise money for the filing fee, petition drive, and campaign. *See Anderson*, 460 U.S. at 791 n.11. This makes the effective cut-off date for an independent candidate to enter the race at least several months before the legal deadline.

An early filing deadline burdens candidates and voters by depriving them of the opportunity to respond to later developments in the political situation. *See*, *e.g.*, *Anderson*, 460 U.S. at 790-91; *Nader v. Brewer*, 531 F.3d 1029, (9th Cir. 2008), *cert denied*, 2009 WL 578703 (Mar. 9, 2009); *Cromer v. South Carolina*, 917 F.2d 819, 823-24 (4th Cir. 1990). The early months of a campaign are rarely static. Candidates rise and fall in popularity. Issues emerge. Positions shift, Scandals happen. These changes create opportunities for new candidates and

political coalitions. *See Anderson*, 460 U.S. at 790-91. Moreover, independent candidacies and voter support for such candidacies are generally a response to the popular nominees, or likely nominees, of the existing parties.

The Supreme Court and Fourth Circuit have recognized that early filing deadlines burden candidates by making the business of campaigning more difficult. *See generally id.*; *Cromer*, 917 F. 2d 819. In *Anderson*, the Court noted that, many months before the election is to take place, "[v]olunteers are more difficult to recruit and retain, media publicity and campaign contributions are more difficult to secure, and voters are less interested in the campaign." 460 U.S. at 792. The January 30 deadline for independents would mean that many candidates would have to begin attempting to gather signatures and raise money more than a year before the general election. This early deadline would also preclude the possibility of gathering signatures during local elections or on primary day, both of which are fertile sources of signatures upon which independent candidates would be unable to draw.

Early effective deadlines also burden independents by putting them at a comparative disadvantage in the electoral process. *See Anderson*, 460 U.S. at 790-91.The ability to select candidates later in the process would give recognized parties and their supporters "the political advantage of continued flexibility." *Id.* at 791. For independents, the inflexibility imposed by an early effective deadline "is a correlative disadvantage because of the competitive nature of the electoral process." *Id.* The ability to campaign when voters are more interested is a further advantage for qualified-party candidates and a disadvantage for independents. These burdens, which fall unequally on independent candidates, "discriminate[] against those candidates and—of particular importance—against those voters whose political preferences lie outside the

existing political parties." *Id.* at 794. They also strike at core First Amendment values by reducing electoral diversity and the marketplace of ideas. *Id.*

The magnitude of these burdens is not difficult to gauge. In *Anderson*, the Supreme Court found that a March 20 deadline for independent candidates imposed burdens sufficiently weighty to warrant strict scrutiny. 460 U.S. at 790-95. The deadline imposed by the defendant is almost a full two months prior to this deadline. The Fourth Circuit has also applied strict scrutiny to a March 30 deadline. *See Cromer v. South Carolina*, 917 F.2d 819, 823-24 (4th Cir. 1990).

A simple review of the application of this deadline in West Virginia is instructive. According to the defendant, independent candidates must file their candidacy papers by January 30. This deadline is more than 283 days before the general election at which an independent candidate would hope to appear on the ballot. Because West Virginia also requires an independent candidate to file a nominating petition and pay a filing fee, the effective deadline is even earlier—perhaps more than a year before the election. By any reasonable standard, that is a long time which imposes a severe burden.

Strict scrutiny is also warranted by the discriminatory nature of West Virginia's early filing deadline. As the Supreme Court explained in *Anderson*, the burdens of an early deadline discriminate against independent candidates and their supporters. 460 U.S. at 794. Under the *Anderson* test, these inequalities warrant strict scrutiny no matter how severe the burdens are. Other courts have struck down arguably less burdensome ballot-access schemes for independent counts. *See, e.g.*, *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876 (3d Cir. 1997); *New Alliance Party v. Hand*, 933 F.2d 1568 (11th Cir. 1991); *Cromer*, 917 F.2d at 819.

Because West Virginia's ballot-access scheme imposes severe and discriminatory constitutional burdens, it must be narrowly drawn to advance a compelling state interest. *Burdick*

v. *Takushi*, 504 U.S. 428, 434 (1992). This step in the *Anderson* test requires the court to: (1) "determine the legitimacy and strength of each of [the state interests asserted to justify the challenged scheme]"; and (2) "consider the extent to which those interests make it necessary to burden the [plaintiff's] rights." *Anderson*, 460 U.S. at 789. The defendant bears the burden of proof on both of these elements. *Burson v. Freman*, 504 U.S. 191, 199 (1992); *Lopez Torres v. New York State Bd. of Elections*, 462 F.3d 161, 203 (2d Cir. 2006), *rev'd on other grounds*, 128 S. Ct. 791 (2008); *Patriot Party v. Allegheny Cty. Dep't of Elections*, 95 F.3d 253, 267-68 (3d Cir. 1996); *Nader v. Brewer*, 531 F.3d 1028, 1039-40 (9th Cir. 2008).

The ACLU finds it difficult to believe that the state could present state interests sufficient to justify a January 30 deadline even when independent candidates are aware of it in advance. As discussed *infra*, the ACLU believes it is impossible for the state to justify retroactive application of such a deadline.

### 2. A Retroactive January 30 Deadline is Unquestionably Unconstitutional.

As discussed *supra*, a January 30 deadline for independent candidates is constitutionally unacceptable. However, in the instant case, the issue is even more dire: the defendant seeks to *retroactively* apply a January 30 deadline to plaintiffs. There is simply no way the state can justify creating a rule in September of 2016 that requires candidates to have filed their candidacy papers in January of 2016. Unless the state has a time machine, there would simply be no way for plaintiffs or other independent candidates to meet such a deadline in this case.

Until this week, Defendant's website informed candidates that the deadline for filing candidacy papers was August 1. *See* Verified Compl. At no time prior to informing plaintiffs that they would be removed from the general election ballot, did the Secretary of State indicate a filing deadline of January 30. "'History . . . ends' for both potential independent candidates and

their supporters on that date." *Cromer v. South Carolina*, 917 F.2d 819, 823 (4th Cir. 1990). "In practical terms this means that as of [January 30], the emergence of independent candidacies to respond to newly emerging issues, or to major party or candidate shifts in position, or to moral, or ethical, or mental, or physical collapses of party candidates in the seven-month interval between filing date and general election date are effectively precluded." *Id.*

> The problem is in having to make the draconian decision at a time when a rational basis for making it does not exist. At this time the party candidates have not been chosen, and even the identity of those who may become candidates may not be known. The election itself is seven months of unfolding events away.

*Id.* If a deadline of March 30, as was present in *Cromer*, is "draconian," one can only imagine what the Fourth Circuit would have to say about an even earlier deadline that is being retroactively applied to independent candidates.

> The only bases upon which one might decide at that time to declare, essentially in the dark, an independent candidacy are (a) determination to seek nomination as an independent, whatever happens or doesn't, (b) prescience or specific foreknowledge of future events affecting issues or other candidates, or (c) willingness to act as a stand-by just in case some need should later arise. While neither of these can be gainsaid as a theoretical possibility, neither suffices as a practical basis for insuring the viability of independent candidacies as the constitutionally protected best means for voter response to late developments affecting issues or party candidates.

*Id.* at 823-24.

A retroactive application of a January 30 deadline, absent time machines provided by the state, is simply an impermissible restriction on the rights of voters who wish to vote for an independent candidate.

### B. Eleventh Amendment Immunity Does Not Apply to Actions for Injunctive Relief.

It is possible that the defendant will argue she is immune to suit in federal court due to Eleventh Amendment immunity. However, the Supreme Court has long held that, "[o]f course a

7

state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989). This is based on the long-accepted doctrine of *Ex parte Young*, 209 U.S. 123 (1908), which held that the Eleventh Amendment does not prohibit federal courts from enjoining state officials from acting in a manner which violates the United States Constitution. *See e.g.*, *Lewis v. W. Va. Supreme Court of Appeals*, 985 F. Supp. 2d 776, 782 (S.D. W. Va. 2013) (Goodwin, J.) ("The *Ex parte Young* doctrine . . . allows federal courts to entertain suits challenging the constitutionality of a state official's action [and] rests on the premise that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes.") (internal citations and quotation marks omitted).

**IV.  Conclusion**

For the foregoing reasons, the American Civil Liberties Union of West Virginia Foundation hereby respectfully requests this Honorable Court grant plaintiffs' motion for a temporary restraining order.


RESPECTFULLY SUBMITTED, this 21st day of September, 2016.

By Counsel,

/s/ Jamie Lynn Crofts
Jamie Lynn Crofts
West Virginia Bar No. 12730
ACLU of West Virginia Foundation
P.O. Box 3952
Charleston, WV 25339-3952
(304) 345-9246, ext. 102 / (304) 345-0207 (f)
jcrofts@acluwv.org