IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

NAOMI SPENCER DALY and
DARRELL CASTLE,

                                  Plaintiffs,

Dorrell W. Arthur,

                                  Intervenor Plaintiff,

v.                                    CIVIL ACTION NO.   3:16-08981

NATALIE TENNANT,
in her official capacity as
Secretary of State of the
State of West Virginia, and
BRIAN WOOD, in his official
capacity as Clerk of the County
Commission of Putnam County,
West Virginia,

                                  Defendants.

**MEMORANDUM OPINION AND ORDER**

       On Monday, September 19, 2016, Plaintiffs Naomi Spencer Daly and Darrell Castle filed a Verified Complaint against Defendant Natalie Tennant, in her official capacity as Secretary of State of the State of West Virginia. The next day, Plaintiffs filed an Emergency Motion for a Temporary Restraining Order. ECF No. 3. The Court provided notice of the action to Defendant Tennant's counsel and directed Defendant Tennant to file a Response by Wednesday, September 21, 2016. The Court further set this matter for hearing on Thursday, September 22. In the interim, the American Civil Liberties Union of West Virginia Foundation (ACLU) filed a Motion for Leave to File Brief Amicus Curiae and Dorrel W. Arthur filed a Motion to Intervene and a Motion to Join

Brian Wood in his Official Capacity as Clerk of the County Commission of Putnam County, West Virginia as an Additional Party Defendant. The Court granted the motion by the ACLU and both motions by Mr. Arthur.

## I.
## FACTS

In this action, Plaintiffs Daly and Castle seek to appear on West Virginia's November general election ballot as candidates of parties that are not recognized by the State of West Virginia.[1] Ms. Daly is the Socialist Equality Party's nominee for the West Virginia House of Delegates in District 16, and Mr. Castle is the Constitution Party's nominee for President of the United States. In order to qualify as a candidate for the general election, Plaintiffs Daly and Castle assert that they submitted their nominating petitions containing a sufficient number signatures (referred to as a "nomination certificate"), their notices of candidacy (referred to as a "certificate of announcement"), and their filing fee to Defendant Tennant before August 1, 2016, pursuant to the instructions on the Secretary of State's website and West Virginia Code § 3-5-23 (setting forth the requirements for obtaining nomination certificates) and § 3-5-24 (providing, in part, that "[a]ll certificates nominating candidates for office under section twenty-three of this article shall be filed not later than August 1 preceding the November general election"). According to Plaintiffs Daly and Castle, at the time they filed, Defendant Tennant's website provided: "To become a no party candidate in the General Election, an individual must submit his or her petition signatures, certificate of announcement, and filing fee with the appropriate filing officer by August 1, 2016."

---

[1]There are currently four recognized parties in West Virginia: the Democratic Party, the Republican Party, the Mountain Party, and the Libertarian Party.

*Verified Compl.* at ¶12.[2] After making their filings, Plaintiffs state that they "received notice on or about August 25, 2016, that they had qualified for the general election ballot." *Id.* at ¶15.

Mr. Arthur, the Intervenor Plaintiff, claims he left the Republican Party in March 2016 and became eligible as an independent candidate for office sixty-one days later pursuant to West Virginia Code § 3-5-7(d)(6). This section provides that a certificate of announcement must include a sworn statement that a candidate for a partisan election must identify his or her political party and affirm that he or she "has not been registered as a voter affiliated with any other political party for a period of sixty days before the date of filing the announcement[.]" W. Va. Code § 3-5-7(d)(6). Promptly after the sixty-day period expired, Mr. Arthur filed a certificate of announcement of his candidacy for Putnam County Commissioner with Brian Wood, in his official capacity as Putnam County Clerk.[3] Mr. Arthur asserts he complied with the requirements for candidacy and is a qualified, non-affiliated candidate for the Office of County Commission, Putnam County, West Virginia.

On September 15, 2016, the Supreme Court of Appeals of the State of West Virginia issued a decision in *Wells v. Miller*, No. 16-0779, 2016 WL 4981285 (W. Va. Sept. 15,

---

[2]Plaintiffs assert Defendant removed these instructions from the website after Plaintiffs filed their Verified Complaint.

[3]West Virginia Code § 3-5-7(b)(2) provides that "[c]andidates for an office or political position to be filled by the voters of a single county . . . [with certain exceptions not applicable to Mr. Arthur] shall file a certificate of announcement with the clerk of the county commission." Likewise, West Virginia Code 3-5-24(b)(2) provides that candidates running for county offices shall file their nomination certificates with the clerk of the county commission.

2016). In its decision, the Court held in Syllabus Point 3 that the 2015 amended version of West

Virginia Code § 3-5-7

> requires any person who is eligible and seeks to hold an office or
> political party position to be filled by election in any primary or
> general election to file a certificate of announcement declaring his
> or her candidacy for the nomination or election to the office.
> Accordingly, candidates who seek to hold an office or political party
> position pursuant to West Virginia Code § 3-5-23 (2009) must
> complete a certificate of announcement in accordance with the
> provisions of West Virginia Code § 3-5-7.

Syl. Pt. 3, *Wells*. "Significantly, West Virginia Code 3-5-7(c) states that such certificate of

announcement must be filed no earlier than the second Monday in January and no later than the

last Saturday in January[.]" *Wells,* 2016 WL 4981285, at *5. For 2016, this deadline was January

30.


Given this pronouncement by the West Virginia Supreme Court, Defendant

Tennant notified Plaintiffs Daly and Castle the next day, Friday, September 16, that they were

being removed from the general election ballot based upon the decision in *Wells* and their failure

to file certificates of announcement on or before January 30, 2016. According to Plaintiffs Daly

and Castle, Defendant Tennant intended to obscure their names with stickers on ballots that would

be sent out on Friday, September 23, 2016. Plaintiffs Daly and Castle contend that it would result

in 17 independent candidates being removed from the ballot. Similarly, Mr. Arthur asserts that

Defendant Tennant directed Defendant Wood, as the Clerk of the County Commission of Putnam

County, to remove his name from the ballot if his certificate of announcement was not obtained

prior to January 30, 2016.[4] Plaintiffs Daly and Castle and Mr. Arthur assert such action is

---

[4]Defendant Tennant's Office sent an e-mail to the County Clerks, including Defendant
Wood, advising them of the *Wells* decision and directing them to review the certificates of

unconstitutional and, therefore, they moved this Court to enter a temporary restraining order enjoining Defendant Tennant from removing their names from the ballot.

## II.
## STANDARD FOR INJUNCTIVE RELIEF

Although Plaintiffs filed their motion as a request for a temporary restraining order, the Court held a full adversary hearing on the motion. All parties received notice of the action and were represented by counsel at the hearing. Defendant Tennant was served a copy of the Verified Complaint and filed a Response. The Court questioned the parties at the hearing whether there were any objections to this Court converting the request for a temporary restraining order into a request for a preliminary injunction. None of the parties objected and, in fact, counsel for Defendant Tennant stated that his client preferred it be treated as a preliminary injunction. Accordingly, in light of these facts, the circumstances of this case, and given the scarcity of time to rule upon the motion, the Court converted the action into one for a preliminary injunction at the hearing.

In deciding whether to issue a preliminary injunction, this Court recognizes that it "is an extraordinary remedy afforded prior to trial at the discretion of the district court that grants relief *pendente lite* of the type available after the trial." *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 345 (4th Cir. 2009), *vacated*, 130 S. Ct. 2371 (2010), *reinstated in part*, 607 F.3d 355 (4th Cir. 2010) (citations omitted). "Granting the ultimate relief requested, even temporarily, at an early point in the case, often prior to the issues even being joined in the pleadings, seems rightly

---

announcement filed with the County Clerks to determine whether they were filed by January 30, 2016. *See* E-mail from Layna Valentine-Brown, Elections Dir. of the W. Va. Sec. of State's Office (Sept. 16, 2016) (Ex. 5, ECF No. 19-5).

reserved for only the most compelling of cases." *Dewhurst v. Century Aluminum Co.*, 731 F. Supp. 2d 506, 514 (S.D. W. Va. 2010). In order to obtain a preliminary injunction, a party must establish four elements: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citation omitted). As such, the party seeking to obtain a "preliminary injunction must demonstrate by a clear showing that, among other things, it is likely to succeed on the merits at trial." *Dewhurst,* 731 F. Supp. 2d at 515 (internal quotation marks and citations omitted). In this action, Plaintiffs and Mr. Arthur assert they easily meet these factors.

## III.
## DISCUSSION

As way of background, West Virginia has a two-tiered ballot-access scheme for candidates seeking to fill a partisan office in the general election. One tier is for candidates from a party recognized by West Virginia. The second tier is for candidates like Plaintiffs Daly and Castle, who belong to unrecognized parties, and Mr. Arthur, who is an independent candidate for office.[5] Those candidates from recognized parties may be nominated by convention or primary. However,

---

[5]West Virginia Code § 3-1-8 provides, in part, that "[a]ny affiliation of voters representing any principle or organization which, at the last preceding general election, polled for its candidate for governor at least one percent of the total number of votes cast for all candidates for that office in the state, shall be a political party, within the meaning and for the purpose of this chapter[.]" W. Va. Code § 3-1-8, in part. As stated in footnote 1, *supra*, the Democratic, Republican, Mountain, and Libertarian parties are recognized currently in West Virginia. In *Wells*, the West Virginia Supreme Court stated that "[a] candidate who is registered and affiliated with a recognized "political party" as defined in West Virginia Code § 3–1–8 (1965) may not become a candidate for political office by virtue of the nomination certificate process outlined in West Virginia Code § 3–5–23 (2009)." Syl. Pt. 4, *Wells*, No. 16-0779, 2016 WL 4981285, at *1 (W. Va. Sept. 15, 2016).

unrecognized-party candidates and independent candidates must file a nomination certificate, a certificate of announcement, and pay a filing fee to appear on a general election ballot.

As explained by the West Virginia Supreme Court in *Wells*, prior to the 2015 amendment to West Virginia Code § 3-5-7, this provision was confined to those candidates participating in the primary election.[6] However in 2015, West Virginia Code § 3-5-7 was significantly amended and the previous language in the statute limiting its application to apply exclusively to primary election candidates was eliminated. *Wells*, 2016 WL 4981285, at *6. Therefore, in light of the language contained in West Virginia Code § 3-5-7(a) applying to both primary and general elections, the West Virginia Supreme Court determined that all candidates seeking offices pursuant to West Virginia Code § 3-5-23 must comply with the certificate of announcement requirements and the January deadline set forth in West Virginia Code § 3-5-7. Plaintiffs Daly and Castle and Mr. Arthur now argue that this requirement is unconstitutional.

When a challenge is brought to a state election law, a court must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiffs seek to vindicate" against "the precise interests put forward by the State as justification for the burden imposed by its rule." *Anderson v. Celebrezze*, 460 U.S. 780,

---

[6]*See* Syl. Pt. 2, *State ex rel. Browne v. Hechler*, 476 S.E.2d 559 (W. Va. 1996) (holding the deadline for filing with the secretary of state the certificate and fee for a person seeking ballot access as a candidate for the office of president or vice-president as the nominee of a third-party otherwise qualifying for inclusion on the general election ballot by method other than primary election is the first day of August preceding the general election [pursuant to W. Va. Code § 3–5–23(a) (1986)], and such persons are not required to file a declaration of candidacy pursuant to W. Va. Code § 3–5–7 (1991)."

789 (1983). In balancing these interests, the court must consider "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id*. In *Anderson*, the United States Supreme Court found an Ohio law that required an independent candidate for President to file his nominating petition and a statement of candidacy on or before March 20, placed an unconstitutional burden on the candidate's supporters' voting and associational rights. Specifically, the Supreme Court recognized that the early filing deadline places independent candidates at a distinct disadvantage in such areas as fundraising, recruiting volunteers, gathering signatures, garnishing media and voters' attention, and even knowing who will be the major party nominees and their platforms. *Id*. at 791. In addition, it prevents such candidates from entering a race after the March deadline based upon political developments that occur after the deadline. *Id*. at 791. In turn, these burdens limit independent-minded voters' opportunities "to associate in the electoral arena to enhance their political effectiveness as a group, . . . threaten[ing] to reduce diversity and competition in the marketplace of ideas." *Id*. at 794. In addition, because the case before it involved a presidential candidate, the Supreme Court found that Ohio's law put "a significant state-imposed restriction on a nationwide electoral process." *Id*. at 795.

Ohio argued the March deadline promotes its interests in "voter education, equal treatment for partisan and independent candidates, and political stability." *Id*. at 796. The Supreme Court found, however, that none of these reasons could justify the March filing deadline. The Supreme Court reasoned that in modern times, it does not take over seven months for individual voters to become knowledgeable about candidates and campaign issues. To the contrary, an early deadline may result in a candidate foregoing participation in local debates, thereby reducing the information known by voters. *Id*. at 798. In addition, the Supreme Court rejected Ohio's argument

that a universal filing deadline results in equal treatment amongst all candidates. The Supreme Court stated that the benefits of an early filing deadline for a primary election, and the administrative benefits of giving a state time to process paperwork and prepare the primary ballot, do not apply to independent candidates running in the general election. *Id*. at 800. In fact, an independent candidate filing in March does not get the benefit that major-party candidates receive by "participat[ing] in a structured intraparty contest to determine who will receive organizational support[.]" *Id*. at 801. Lastly, although a state may have an interest in promoting political stability by preventing parties from being splintered and having unrestrained factionalism, it could not justify Ohio's deadline as applied to a candidate for President as "no State could singlehandedly assure 'political stability' in the Presidential context." *Id*. at 804. Therefore, the Supreme Court concluded that the burden on "voters' freedom of choice and freedom of association" under the Ohio law, "in an election of nationwide importance, unquestionably outweigh the State's minimal interest in imposing a March deadline." *Id*. at 806.

Applying the *Anderson* standard in *Cromer v. South Carolina*, 917 F.2d 819 (4th Cir. 1990), the Fourth Circuit found South Carolina's 200-day filing deadline for independent candidates running for the state legislature constitutes an unconstitutional burden upon such candidates' access to the general election ballot. 917 F.2d at 821. The Fourth Circuit recognized that the primary concern when restrictions are placed on ballot access is not the interest of the candidate, but the interests of "the voters who support the candidate and the views espoused by the candidate." *Id*. at 822, citing *Anderson*, 460 U.S. at 786-88. Ballot restrictions burden voters' right to association under the First and Fourteenth Amendments. *Id*.

An impingement upon these rights may be justified by a state's interest "in protecting the electoral process from chaos and disorder, and major political parties from unfair debilitation[.]" *Id*. at 822-23. In addition, a reasonable regulation may be justified when it protects "the integrity of established and formally recognized major political parties, [however,] these may not extend to the effective exclusion of independent (and new party) candidacies, which serve important safety-valve purposes not adequately served by major party candidacies alone, or by the availability of write-in candidates." *Id*. at 823, citing *Anderson*, 460 U.S. at 790-94, 799 n.26. Moreover, as stated by the Fourth Circuit, independent candidates, as opposed to new third party candidates, are entitled to even greater protection because of "the peculiar potential that independent candidacies have for responding to issues that only emerge during or after the party primary process," as compared to the state's heightened interest in controlling the formation of new political parties." *Id.,* citing *Anderson*, 460 U.S. at 790-92. With regard to new parties, a state does have an additional interest in regulating their formation because new parties have the potential to control state government for a long time, a "potential not possessed by independent candidates[.]" *Id*., citing *Storer v. Brown*, 415 U.S. 724, 745 (1974).

In applying the basic principles of *Anderson*, the *Cromer* court determined that the magnitude and character of the injury to the voters "is practically total." *Id*. at 824. The Fourth Circuit reasoned that the March deadline forces an independent candidate to make a "draconian decision" to run for office before a rational basis for such decision exists. *Id*. at 823. Such decision would have to be made based upon premonitions of what may or may not happen in the future because the deadline prematurely cuts off such candidate's opportunity to respond to later developments. Although the Supreme Court in *Anderson* accounted for some injuries resulting

-10-

from the fact that the challenge was made by a presidential candidate, the Fourth Circuit found these factors to be "add-on injuries to the central and decisive injury inflicted by imposing so early a cut-off of the opportunity to enter the political arena." *Id*. at 824 (citation omitted).

As in *Anderson*, the Fourth Circuit also rejected the significance of South Carolina's argument that the early deadline promoted the integrity and order to the election process and diminished the chance of "unnecessary feuding by parties and independent candidates on the general election ballot and in preventing splintered parties and unrestrained factionalism." *Id*. (internal quotation marks and citation omitted). Specifically, the Fourth Circuit stated that equal treatment of unequal candidates results in inequality, and the pre-primary filing deadline "may actually impair rather than promote party harmony by encouraging pre-primary defalcations by splinter groups and individuals." *Id.* at 825 (citations omitted). Thus, the Fourth Circuit held that these justifications for the early filing deadline fell short.

Weighing the "essentially total" injury to voters' rights with the "insignificant" reasons justifying the policy, the Fourth Circuit concluded it was obvious that voters' rights substantially outweighed South Carolina's justifications for the deadline. Although a state does need a time period to perform administrative tasks and time is needed for voter education, the Fourth Circuit stated that a "state surely could require independent candidates to declare and perfect their candidacies 60 to 90 days before a general election." *Id*. The Fourth Circuit found no reason in the case before it that would justify "a filing deadline for independent candidates seven

months ahead of the general election." *Id.* Accordingly, the Fourth Circuit found the March 30 deadline was unconstitutional. *Id.*[7]

Following *Anderson* and *Cromer*, the United States Supreme Court clarified in *Burdick v. Takushi*, 504 U.S. 428 (1992), the degree of scrutiny that must be applied to state election laws. The Supreme Court stated that:

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289, 112 S. Ct. 698, 705, 116 L.Ed.2d 711 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S., at 788, 103 S. Ct., at 1569–1570; *see also id.*, at 788–789, n. 9, 103 S. Ct., at 1569–1570, n. 9.

*Burdick*, 504 U.S. at 434. Utilizing the *Anderson/Burdick* framework, the Fourth Circuit recently explained in *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708 (4th Cir. 2016), that "[l]aws imposing only modest burdens are usually justified by a state's important regulatory interests. Laws imposing severe burdens, on the other hand, must be narrowly drawn to advance a state interest of compelling importance," and "are thus subject to strict scrutiny." 826 F.3d at 716-17 (internal quotation marks and citations omitted).

In the present case, the Court finds that strict scrutiny applies. The January deadline imposed here is even more severe than the deadlines found to be unconstitutional in *Anderson* and

---

[7]In *Wood v. Meadows*, 117 F.3d 770 (4th Cir. 1997), the Fourth Circuit clarified that a filing deadline greater than 90 days is not *per se* unconstitutional.

*Cromer.* Not only is the general election deadline for unrecognized party candidates and independent candidates simultaneous with the deadline for recognized party candidates, it is 284 days before the general election and 102 days before the primary election. The character and magnitude of this burden is significant. It unmistakably places a substantial burden on and discriminates against those candidates and voters "whose political preferences lie outside the existing political parties." *Anderson*, 460 U.S. at 794 (citation omitted). The January deadline deprives these candidates from knowing the political climate of the major parties and what issues will come to the forefront during campaigns. It also seriously impairs their abilities to raise support, money, and recognition for their campaigns. For Mr. Arthur, the deadline is even more draconian because he dissociated himself with the Republican Party to become an independent candidate. As West Virginia law required him to be dissociated with the Republican Party for at least 60 days before the January filing deadline, Mr. Arthur would have to decide to run as an independent candidate in November of 2015—nearly an entire year before the general election—in order to qualify as a candidate in the general election in November of 2016. As in *Cromer*, the injury here is "practically total."

As in *Cromer*, West Virginia justifies the deadline by arguing it provides for voter education, equality amongst the candidates, and orderly elections. However, for the same reasons the Fourth Circuit stated in *Cromer* and the United States Supreme Court stated in *Anderson*, the Court finds that these justifications are inadequate with respect to both the unrecognized-party candidates and the independent candidate. It is simply not credible to suggest that voters need 284 days to become educated about independent and unrecognized party candidates. In fact, as noted in *Anderson*, the early deadline actually has the opposite effect by restricting candidates that

-13-

independent voters may want to consider. *See Anderson*, 460 U.S. at 792-94. Additionally, a simultaneous deadline for all candidates does not create equality amongst the candidates because independent and unrecognized third-party candidates are unequal at the start of the process. *Wood v. Meadows*, 207 F.3d 708, (4th Cir. 2000) (recognizing that "'[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike'" (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)). Relying upon *Anderson*, the Fourth Circuit found in *Cromer* that "both the 'equal treatment' and 'feuding and factionalism-reduction' claims of interest lacking in significance." *Id.* at 824. Likewise, these factors are insignificant under the facts of the present case. Although West Virginia does have some administrative interests in verifying signatures and preparing the general election ballot, for years it has been able to accomplish these goals within the previous deadline of August 1. There simply is no reason to argue that it now will take 284 days to accomplish the same tasks.  Furthermore,  despite  the state's heightened interest in regulating minor party candidates and the fact that "minor party candidates, unlike independents, will make their decision to run for office and espouse their party's separate platform notwithstanding which major party's candidates emerge from the primary and without regard to the issues emphasized by the major parties," *Hess v. Heckler*, 925 F. Supp. 1140, 1154 (1995) (upholding West Virginia's primary eve deadline for minor party candidates), the heavy burden on supporters and minor party candidates by enforcing such an early filing deadline substantially outweighs these additional state interests.

Therefore, in assessing the significant injuries to voters' rights with respect to both independent and minor party candidates as being "practically total" with the insignificant interests

espoused by West Virginia to justify its deadline, the Court finds the former substantially outweighs the later and the filing requirement is unconstitutional.[8]

## IV.
## CONCLUSION

Accordingly, the Court finds Plaintiffs Daly and Castle and Intervenor Plaintiff Arthur have shown success on the merits, irreparable harm in the absence of relief, a balance of equities in their favor, and a public interest in issuing a preliminary injunction. Thus, as stated at the hearing and in the Court's Order entered on September 22, 2016, the Court **GRANTS** the Preliminary Injunction.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        October 21, 2016

ROBERT C. CHAMBERS, CHIEF JUDGE

---

[8]The Court reaches this decision without even factoring in the "add-on injuries" related to Plaintiff Castle as he is running for President.